CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

NOV 0 5 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

THE ESTATE OF HEZEKIAH HARVEY, )
Decedent, by and through his legal )
representative, ALICE ANN DENT, )
ADMINISTRATOR, )
                         )
        Plaintiff, )
                         )
v. )
                         )
ROANOKE CITY SHERIFF'S OFFICE, )
et al., )
                         )
        Defendants. )

Civil Action No. 7:06CV00603

**MEMORANDUM OPINION**

By: Hon. Glen E. Conrad
United States District Judge

On the night of Saturday, February 4, 2006, Hezekiah Harvey was arrested and taken to

the Roanoke City Jail. Three days later, Harvey was transported from the jail to Carilion

Roanoke Memorial Hospital, where he went into cardiac arrest and died on February 9, 2006.

Alice Ann Dent, Harvey's sister and the administrator of his estate ("the plaintiff"), subsequently

filed this civil rights action asserting a variety of claims under 42 U.S.C. §§ 1983, 1985, and

1986 and Virginia law. The case is presently before the court on the motion for summary

judgment filed by the Roanoke City Sheriff's Office; Sheriff Octavia Johnson; and Deputies Neil

Moses, Clinton Phillips, Terry Martin, Todd Francis, Travis Hayslett, and Lewis Kellison

(collectively referred to as "the Sheriff's Office defendants"); as well as the motion for summary

judgment filed by Prison Health Services, Inc. ("PHS"); Anita Cruff; Tom Berdeen, M.D.; Joann

Dunn, R.N.; Kristy Hodges; Tiffany Lloyd; Delilah Browley, L.P.N.; Neil Musselman, M.D.;

Teresa Campbell; Rita Dame; and Shannon Shepard (collectively referred to as "the medical

defendants"). For the reasons that follow, the court will grant both motions for summary judgment.

## Factual Background

The following facts are presented in the light most favorable to the plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that "all evidence must be construed in the light most favorable to the party opposing summary judgment").

In the late evening hours of Saturday, February 4, 2006, Roanoke City police officers arrested Hezekiah Harvey for malicious wounding after Harvey stabbed his girlfriend. The officers took Harvey to the Roanoke City Jail, where he was booked after midnight on Sunday, February 5, 2006.

Deputies at the jail noticed that Harvey had a black eye. When the deputies asked Harvey how he received it, Harvey became wild and hostile. He yelled that his girlfriend had given him the black eye and broken his ribs, that a police officer had planted cocaine on him, and that he should not have been arrested.

Harvey was familiar to many of the jail's deputies, since he had been arrested many times. He often entered the jail acting in a similar manner. After a few days, Harvey normally settled down and became manageable.

Deputies placed Harvey in cell 17, where he continued to act in a disorderly manner. Harvey stopped up the cell toilet with his clothes, and threw feces and toilet paper out of the toilet. When deputies were serving breakfast on the morning of February 5, 2006, Harvey threw feces and toilet paper at the deputies and the kitchen trustees. The deputies shielded themselves and the trustees with mattresses, so that they could finish serving breakfast.

2

After breakfast, the deputies decided to move Harvey to cell 4 near intake, since it had a solid door that would prevent Harvey from throwing things out of his cell. Sergeant Leo Watkins supervised the cell extraction, and deputies from both the night shift and the day shift assisted with the task. Harvey had taken off all of his clothes, and the deputies used riot shields to protect themselves from the bodily fluids and other materials that Harvey threw at them. When the deputies opened Harvey's cell door, Harvey charged the door and the deputies used the shields to hold Harvey back. Harvey subsequently slipped on the wet floor, and one of the deputies pinned him on the ground with a shield, so that other deputies could gain control of him.

After the deputies placed Harvey in cell 4, Harvey apologized for making a mess.[1] Harvey voiced no complaints and none of the deputies observed any sign of injury. Nonetheless, the deputies called the medical department, and Nurse Paige Puckett visited Harvey's cell at 10:00 a.m. on Sunday. Nurse Puckett noted that Harvey had a small abrasion on his right side, and that she could not clean or treat the abrasion because of Harvey's agitated state.[2]

Shortly after noon on Sunday, February 5, 2006, deputies attempted to serve Harvey a bag lunch. He became combative when the deputies entered his cell, and it took several deputies to gain control of him. During the struggle, Harvey bit Deputy Derek Stokes twice and kicked another deputy in the leg. The deputies called the medical department after the incident, and

---

[1] According to Sergeant Watkins, Harvey often fluctuated from acting hostile to being cooperative.

[2] Since Octavia Johnson became the Roanoke City Sheriff on January 1, 2006, the medical and mental health services for the inmates at the jail have been provided by Prison Health Services, Inc. (PHS), pursuant to a contract between PHS and the Sheriff. PHS specializes in providing medical and mental health care in the correctional setting. The medical staff that PHS provides for the jail includes an around-the-clock nursing staff, as well as a physician and a psychiatrist, who, when they are not on-site, are on-call twenty-four hours a day, seven days a week.

3

Nurse Puckett visited Harvey's cell to see if he was injured. Harvey refused to be examined and proceeded to masturbate in front of the nurse.

The plaintiff called the jail on Sunday afternoon and spoke to a male deputy. The plaintiff told the deputy that Harvey was under hospice care and that he needed his medications. When the plaintiff asked if she could visit Harvey, the deputy advised her that she could not visit him, because he was spitting, throwing urine, and wearing no clothes. The plaintiff called the jail again a few hours later and spoke to a nurse. The nurse advised the plaintiff that she would need to call back on Monday and speak to the head nurse.

A new group of deputies began working the day shift on Monday, February 6, 2006 at 6:30 a.m., including all of the deputies named as defendants in the plaintiff's amended complaint. When Master Deputy Neil Moses relieved the prior shift, Moses spoke to a couple of the deputies in the intake area of the jail and heard Harvey beating on his cell door. One of the deputies on the prior shift advised Moses that Harvey had bitten Deputy Stokes. The deputies also mentioned that they had moved Harvey to cell 4 to keep him from throwing feces and urine out of the cell.

When Deputy Moses made his rounds on the morning of February 6, 2006, Moses checked on Harvey and saw that Harvey was completely naked. Harvey called Moses by name and threatened to "throw piss" on Moses. (Moses Decl. pg. 2). Moses noticed that Harvey's cell contained cartons filled with urine and feces, and that Harvey had smeared feces around his cell. Moses subsequently called the medical department to see if Harvey had been examined, because Moses believed that Harvey might have been going through some sort of drug withdrawal, and Moses did not remember ever having seen Harvey behave in such a manner.

4

Sergeant Terry Martin also spoke with Harvey after Martin came on duty Monday morning. Harvey recognized Martin and called him by name. Because Harvey was completely naked and using a carton to scoop substances out of his toilet to throw around his cell, Martin called the medical department to make sure that the medical personnel were aware of Harvey's behavior. The medical personnel advised Martin that they had checked on Harvey over the weekend, and that they were aware of his behavior. Deputy Clinton Phillips also contacted the medical department after Phillips saw Harvey aggressively hit his cell door and window with his head and hands. In addition, Deputy Phillips made rounds with a PHS nurse, so that he could make sure that the nurse observed Harvey's behavior.

The deputies who worked the day shift on Monday decided to clean Harvey's cell, because they were afraid that Harvey would slip and fall on the urine and feces in the cell. Several deputies, including Sergeant Martin, Deputy Moses, Deputy Phillips, and Sergeant Todd Francis, eventually moved Harvey out of his cell so that it could be cleaned. During the extraction, Harvey was combative. He tried to bite Deputy Phillips and he attempted to spit on Deputy Moses. The deputies tried to persuade Harvey to get dressed, but Harvey refused to put on any clothes.

At approximately 10:00 a.m. on Monday, Joann Dunn, a registered nurse, attempted to talk to Harvey.[3] Nurse Dunn noted on Harvey's interdisciplinary progress chart that Harvey was yelling and banging on his cell door, that he had smeared feces on the cell window, and that he

---

[3] Nurse Dunn served as PHS's Health Services Administrator during the time period at issue. She is now the Director of Nursing at the jail.

5

was completely undressed and masturbating. Nurse Dunn also noted that she would refer Harvey to the psychiatrist.

When Nurse Dunn checked on Harvey again on Monday afternoon, his behavior had not changed. Consequently, Nurse Dunn called Dr. Neil Musselman, PHS's staff psychiatrist for the jail. Dr. Musselman prescribed Haldol, an antispsychotic medication, as well as a medication for anxiety. Nurse Dunn "knew [Harvey] had a psychiatric history," and "felt that if [they] got antipsychotic medication on board in his system that it wouldn't be a necessity at that point to get him to a hospital." (Dunn Dep. pgs. 13, 25).

Harvey was supposed to begin taking the medications immediately. When Nurse Dunn attempted to administer Harvey's morning dose of Haldol to him on Tuesday, February 7, 2006, Harvey spat the medication in the toilet.[4] That same morning, Nurse Dunn received a telephone call from the plaintiff. The plaintiff advised Nurse Dunn that Harvey had been in hospice care for various medical problems, that he had been given approximately six months to live, that he had been hit by a car a couple of weeks prior to his arrest, and that he needed his medications.

Based on this new information and Harvey's behavior, Nurse Dunn asked the PHS mental health counselor, Kristy Hodges, to contact Carilion Hospice and request information regarding Harvey's treatment. Hodges also called Emergency Outreach Services to inquire as to whether the organization had recently seen Harvey. Hodges reported to Nurse Dunn that Carilion Hospice was in the process of discharging Harvey due to noncompliance.

---

[4] The record indicates that medical personnel at the Roanoke City Jail are not permitted to forcibly medicate an inmate. See, e.g., Musselman Dep. pg. 13; Roanoke City Sheriff's Office Policy No. J-1-02.

6

Nurse Dunn then called Dr. Thompson Berdeen, the PHS physician for the jail, and informed him of Harvey's behavior and the phone call she had received from Harvey's sister. Dr. Berdeen decided that Harvey needed to go to the emergency room, and Nurse Dunn directed her administrative assistant to call 911. Because Nurse Dunn advised the administrative assistant that Harvey's condition "was not a dire emergency insofar as he was not unconscious or not breathing," (Dunn Aff. pg. 4), Carilion Transport, a basic life support unit, was dispatched to retrieve Harvey instead of an advanced life support unit.

Nurse Dunn subsequently advised Sergeant Francis that an ambulance had been called, and Francis relayed the message to Sergeant Martin. Sergeant Francis, Sergeant Martin, and other deputies, who were working the day shift, gathered and discussed various options for removing Harvey from his cell. Sergeant Martin and Deputy Moses attempted to persuade Harvey to get dressed and cooperate, but Harvey refused and became agitated. After considering the fact that Harvey had either bitten or tried to bite some of the deputies, that he had thrown bodily fluids at the deputies, that he was naked and wet, and that they believed that Harvey was HIV and Hepatis C positive, the deputies decided that the safest way to remove Harvey from his cell would be to throw a blanket over his head and pull him into the hallway, where deputies could restrain him to be transported to the hospital. A blanket had been used successfully in the past to handle an inmate who was spitting and needed to be removed from his cell.

The deputies decided to wait until the ambulance arrived before they tried to remove Harvey from his cell and restrain him for transport. The deputies also tried to see if Harvey

7

would willingly come out of his cell, but he yelled at them in response and hit his head and fists on his cell window.

After the ambulance arrived, Martin, Moses, and several other deputies entered Harvey's cell and threw the blanket over Harvey's head. The deputies then pulled Harvey out of the cell and took him to the floor in the hallway. When Harvey tried to bite one of the deputies, the deputies positioned the blanket in front of Harvey's face to prevent him from biting. Although Harvey continued to kick, scream, and spit, the deputies eventually gained control of Harvey and placed handcuffs, leg shackles, and a waist chain on him.

The Carilion Transport ambulance was attended by two emergency medical technicians ("EMTs"), Joshua Fisher and Mark Altman. When Fisher and Altman entered the jail, the deputies were in the process of trying to restrain Harvey on the floor. Harvey was fighting with the deputies, kicking, screaming, and cursing. According to Altman, one of the deputies struck Harvey several times on the back, when Harvey "kept fighting and being combative against [the deputies]." (Altman Dep. pgs. 14, 57-58).[5]

After the deputies restrained Harvey, Fisher directed the deputies to place Harvey face down on a stretcher. Harvey continued to kick, grab, and struggle to get out of the restraints. Consequently, Fisher, the EMT responsible for driving the ambulance, retrieved "spider straps" from the vehicle to place on Harvey. (Fisher Dep. pgs. 41-42).

---

[5] The court notes that Altman testified at his deposition that he did not know who struck Harvey, and that he would not recognize any of the deputies if he saw them again.

8

Deputy Phillips and Deputy Kellison rode in the back of the ambulance with Harvey and Altman on the way to the hospital. The deputies kept the blanket over Harvey's face to prevent him from biting or spitting on the deputies or the Carilion personnel. Harvey continued to breathe, move around, and talk during the three to four minute trip to the emergency room. Fisher testified at his deposition that Harvey screamed the entire way to the hospital, and that Harvey was still trying to get out of the restraints when they arrived at the hospital. Likewise, Altman, who traveled in the back of the ambulance with Harvey, testified that the blanket did not appear to cause Harvey any medical distress.

Upon arriving at the hospital, the deputies and EMTs wheeled Harvey into a hallway, where he remained until an emergency room bed became available. An emergency room nurse asked what was wrong with Harvey, and why he was restrained in such a manner. In response, Deputy Phillips said that he did not know what was wrong with Harvey, that Harvey was possibly coming down from heroin, that Harvey had been fighting the deputies, and that the deputies did not want anyone to get hurt.

When an emergency room bed became available, Harvey was moved to the bed and shackled again. At that point, an emergency room nurse asked about the blanket over Harvey's head, and whether the deputies had a mask. Deputy Phillips advised the nurse that the deputies would use a mask if the hospital had one. A male nurse retrieved a surgical mask, and Deputy Phillips placed it on Harvey. During that time, Harvey remained combative.

One of the female nurses subsequently attempted to start an intravenous line. She became irate when Deputy Phillips continued to hold onto Harvey's arm and told him to let Harvey go. The nurse then asked if Harvey was breathing. Deputy Phillips responded in the affirmative, and

9

pointed to the area that had been rising and falling. They saw Harvey take a breath, and then they waited for another. The nurse then screamed that Harvey was not breathing, and additional medical personnel ran over to Harvey.

Harvey had gone into cardiac arrest, and the emergency room personnel resuscitated him and moved him to an intensive care unit. He passed away on February 9, 2006 after he was removed from life support. Hospital records indicate that Harvey had a history of schizophrenia, severe congestive heart failure, alcoholic liver cirrhosis, Hepatis C, and HIV. He also had a history of alcohol and drug abuse. Harvey had begun receiving care from Carilion Hospice Services in early November of 2005 for congestive heart failure and cirrhosis of the liver. He had been given less than six months to live.

William Massello, III, M.D., who served as the Assistant Chief Medical Examiner for Western Virginia at the time, investigated Harvey's death and performed the autopsy. Dr. Massello concluded that Harvey died from natural causes – excited delirium due to chronic schizophrenia with a contributing cause of congestive cardiomyopathy. Dr. Massello further determined that Harvey did not die of asphyxia or positional asphyxia. Additionally, during his deposition, Dr. Massello testified that neither Harvey's face-down placement on the stretcher nor the blanket used by the deputies played any role in Harvey's death, and that a surgical mask would have been more obstructive than the blanket. Dr. Massello also testified that Harvey would have likely gone into cardiac arrest even if the deputies had not restrained him at all. In addition, Dr. Massello testified that, because antipsychotic drugs can worsen a heart condition, he could not determine whether it would have made a difference if the PHS medical personnel had

10

been able to get an antipsychotic medication into Harvey's system. Dr. Massello emphasized that the medication "might have helped," or it "might have killed him." (Massello Dep. pg. 14).

The plaintiff has designated Michael G. Conner, Psy.D. as an expert witness. Dr. Conner is a licensed clinical psychologist, who practices in Oregon. In his original expert report, dated February 12, 2008, Dr. Conner opined that a mental health evaluation and a psychiatric examination should have been performed as part of Harvey's medical intake; that Harvey exhibited "acute symptoms of delirium and/or psychosis"; that Harvey "was subsequently restrained in an improper and unsafe manner and transported to an ER by underqualified professionals"; that the manner in which Harvey was restrained "resulted in a prolonged state of a restricted airway, impaired movement of the diaphragm and suffocation"; that the manner of restraint utilized was "medically dangerous and unnecessary once Mr. Harvey was placed in medical care"; and that "[t]he physiological consequence can lead to increased cardiopulmonary demand, cardiopulmonary dysfunction, and/or cardiac arrest." (Conner Report pgs. 6-7). Dr. Conner further opined that the decision to request Carilion Transport, a basic life support unit, was negligent; that Harvey's ongoing struggle during transport contributed to an oxygen deficit; that the jail's medical personnel "incorrectly assumed Mr. Harvey was psychotic . . . without recognizing or reporting delirium"; that Harvey should have been examined by a physician at the jail; that the use of force by the deputies could have been avoided; and that "Harvey's behavior was [severely] out of control because he was allowed to decompensate for several days in a jail cell without medically necessary evaluation and treatment for a life threatening condition." (Conner Report pgs. 7-9).

11

Dr. Conner was deposed on July 11, 2008. During his deposition, Dr. Conner testified that the deputies should have known that Harvey had a heart condition; that the deputies should have spoken to a physician before they removed Harvey from his cell to be transported to the hospital; and that the deputies should have asked a physician whether they could "give [Harvey] an IV or . . . an injection" or "sedate him." (Conner Dep. pgs. 230-231). Dr. Conner further testified that "sedation is a proper response for anyone who is trained in how to recognize and deal with delirium." (Conner Dep. pg. 231).

In a supplemental report, dated July 17, 2008, Dr. Conner added that "[m]edication could have been administered involuntarily because it was a psychiatric/medical emergency"; that advanced life support was a medical necessity; that Harvey "was left in a prolonge[d] degrading state of serious mental illness with untreated medical problems before dying"; and that a "dereliction of individual and institutional duty in this case-specific situation directly led to extraordinary pain and suffering and the ultimate loss of life." (Conner Supplemental Report pgs. 20-22).

**Procedural History**

The plaintiff filed this civil rights action on October 10, 2006. In her original complaint, the plaintiff asserted claims against the Roanoke City Sheriff's Office, Sheriff Octavia Johnson, Neil Moses, Clinton Phillips, the City of Roanoke, and other John and Jane Does, under 42 U.S.C. §§ 1983, 1985, and 1986, and Virginia law. In the first count of the original complaint, the plaintiff alleged that the defendants violated Harvey's Eighth Amendment right to be free from cruel and unusual punishment by using excessive force against him and by acting with deliberate indifference to his serious medical needs. The plaintiff also alleged that the defendants

12

violated Harvey's right to due process under the Fourteenth Amendment. In her second and third counts, the plaintiff asserted conspiracy claims under 42 U.S.C. §§ 1985 and 1986. In her fourth count, the plaintiff alleged that the Sheriff's Office, Sheriff Johnson, and the City failed to adequately train and supervise the deputies, and in her fifth count, the plaintiff asserted a claim for negligent hiring and retention. In addition to the aforementioned claims asserted under §§ 1983, 1985, and 1986, the plaintiff asserted the following claims under state law: battery, assault, civil conspiracy, breach of a non-delegable fiduciary duty, outrageous conduct, intentional infliction of emotional distress, and wrongful death.

The defendants named in the original complaint subsequently moved to dismiss the complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. By memorandum opinion and order entered February 23, 2007, the court granted the City of Roanoke's motion and dismissed all of the plaintiff's claims against the City. The court also granted in part and denied in part the motion to dismiss filed by the original Sheriff's Office defendants. Specifically, the court denied the motion with respect to the following claims: the plaintiff's claims for deliberate indifference, excessive force, and failure to train under § 1983, and the plaintiff's state law claims for assault, battery, conspiracy, breach of a non-delegable fiduciary duty, intentional infliction of emotional distress, and wrongful death.

On November 19, 2007, the plaintiff was granted leave to file an amended complaint. The amended complaint names the following entities and individuals as defendants: the Roanoke City Sheriff's Office; Sheriff Octavia Johnson; Deputy Neil Moses; Deputy Clinton Phillips; Deputy Travis Hayslett; Deputy Lewis Kellison; Sergeant Terry Martin; Sergeant Todd Francis;

13

Prison Health Services, Inc. (PHS); Joann Dunn, RN; Paige Puckett, LPN; Daphne Norman, LPN; Tiffany Lloyd; Jeffrey Leary, LPN; Shannon Shepard, EMT; Brenda Todd, LPN; Donnie Surber, EMT; Shilo Carpenter, LPN; Rita Dame; Jammie Smith; Delilah Browley, LPN; Makia Pierson, RN; Audrey Bragg, RN; Robert Cook, EMT; Kristy Hodges; Anita Cruff; Teresa Campbell; Tom Berdeen, MD; Neil Musselman, MD; and other unknown John and Jane Does.[6] The amended complaint includes the same claims that were asserted in the original complaint, with the exception of the claim for outrageous conduct.[7]

On August 4, 2008, a motion for summary judgment was filed by the Roanoke City Sheriff's Office, Sheriff Octavia Johnson, Neil Moses, Clinton Phillips, Terry Martin, Todd Francis, Travis Hayslett, and Lewis Kellison ("the Sheriff's Office defendants"). That same day, a motion for summary judgment was filed by Anita Cruff, Dr. Tom Berdeen, Joann Dunn, Kristy Hodges, Tiffany Lloyd, Delilah Browley, Dr. Neil Musselman, Teresa Campbell, Rita Dame, Shannon Shephard, and PHS ("the medical defendants"). On August 23, 2008, the plaintiff filed a response to the motions for summary judgment, followed by a motion for leave to respond out of time.[8]

---

[6] The plaintiff did not effect service of process on Paige Puckett, Daphne Norman, Jeffrey Leary, Brenda Todd, Donnie Surber, Shilo Carpenter, Jammie Smith, Makia Pearson, Audrey Bragg, Robert Cook or the John and Jane Doe defendants, and the time for doing so has expired. Consequently, the plaintiff's amended complaint will be dismissed as to these defendants, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

[7] To the extent the plaintiff reasserts claims that were previously dismissed from her original complaint, for failure to state a claim upon which relief may be granted, the court remains convinced that those claims are subject to dismissal. The court notes that the amended complaint includes no additional allegations with respect to those claims, which would affect the court's previous decision.

[8] The plaintiff's motion for leave to respond out of time will be granted, and the defendants' motion to strike the plaintiff's response to the summary judgment motions will be denied.

14

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, however, the burden shifts to the nonmoving party to show that such an issue does, in fact, exist. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The nonmoving party must set forth more than a "mere . . . scintilla of evidence" to forestall summary judgment. Anderson, 477 U.S. at 252. Thus, "unsupported speculation . . . is not sufficient to defeat a summary judgment motion." Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-412 (4th Cir. 1986).

## Discussion

### I.    Plaintiff's Claims Under 42 U.S.C. § 1983

In her amended complaint, the plaintiff asserts several claims against the defendants

under 42 U.S.C. § 1983, which imposes civil liability on any person acting under color of state law to deprive another person of rights and privileges secured by the Constitution and laws of the United States. Specifically, the plaintiff alleges that the deputies and the individual medical defendants violated Harvey's rights under the Due Process Clause of the Fourteenth Amendment, by acting with deliberate indifference to Harvey's serious medical needs.[9] The plaintiff also alleges that the deputies violated Harvey's right to due process by using excessive force against him. Additionally, the plaintiff alleges that the Roanoke City Sheriff's Office, Sheriff Johnson, and PHS failed to adequately train and supervise the deputies and the jail's medical personnel.

### A.     Plaintiff's Deliberate Indifference Claim

As a general rule, "[o]nly governmental conduct that 'shocks the conscience' is actionable as a violation of the Fourteenth Amendment." Young v. City of Mount Ranier, 238 F.3d 567, 574 (4th Cir. 2001) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 845-846 (1998)). The degree of culpability on the part of correctional officials that is sufficient to shock the conscience depends on the particular circumstances of the case. Id. "In cases where the government is accused of failing to attend to a detainee's serious medical needs, . . . conduct that amounts to deliberate indifference . . . is viewed as sufficiently shocking to the conscience that it

---

[9] The court notes that the plaintiff also alleges that the defendants' conduct violated Harvey's rights under the Eighth Amendment. However, because it is clear from the record that Harvey was a pretrial detainee at the time of the events in question, the Eighth Amendment does not apply. Instead, the plaintiff's claims pertaining to Harvey's care and treatment arise solely under the Due Process Clause of the Fourteenth Amendment. See Riley v. Dorton, 115 F.3d 1159, 1166 (4th Cir. 1997). Nonetheless, a pretrial detainee's due process rights are "co-extensive" with a convicted prisoner's rights under the Eighth Amendment. Turner v. Kight, 121 Fed. Appx. 9, 13 (4th Cir. 2005) (citing Hill v. Nicodemus, 979 F.2d 987, 990-992 (4th Cir. 1992)).

Case 7:06-cv-00603-GEC   Document 122   Filed 11/05/08   Page 16 of 34   Pageid#: 2903

can support a Fourteenth Amendment claim." Parrish v. Cleveland, 372 F.3d 294, 302 (4th Cir. 2004) (internal citation and quotation marks omitted).

The standard for deliberate indifference is "very high" – "a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Instead, an official acts with deliberate indifference only when he "knows of and disregards" the risks posed by the detainee's serious medical needs. Farmer v. Brennan, 511 U.S. 825, 837 (1994). In order to be liable under this standard, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. "Stated somewhat differently, deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Parrish, 372 F.3d at 302 (internal citation and quotation marks omitted) (emphasis in original).

### 1.    The Medical Defendants

In moving for summary judgment, the medical defendants argue that no rational trier of fact could find that Nurse Dunn, Dr. Musselman, Dr. Berdeen, or Kristy Hodges acted with deliberate indifference to Harvey's medical needs.[10] The medical defendants emphasize that Nurse Dunn first saw Harvey on Monday, February 6, 2006, after having had the weekend off, and that Dunn noted that Harvey was acting in an inappropriate and psychotic manner. Nurse Dunn subsequently contacted Dr. Musselman, the staff psychiatrist, who prescribed medications for the medical staff to administer immediately. Following her phone conversation with the

---

[10] The court notes that it is undisputed that Anita Cruff, Shannon Shepard, Rita Dame, Delilah Browley, and Tiffany Lloyd had no contact or involvement with Harvey during the time period at issue, and thus, that the plaintiff has no viable claim against these medical defendants.

17

plaintiff on February 7, 2006, and after having observed Harvey spit out his medication, Nurse Dunn contacted the medical director, Dr. Berdeen. The doctor ordered that Harvey be transported to the emergency room. Nurse Dunn also asked Hodges, the mental health counselor, to contact Carilion Hospice and request further information regarding Harvey's treatment. Based on the foregoing evidence, the medical defendants argue that Nurse Dunn, Dr. Musselman, Dr. Berdeen, and Kristy Hodges "acted reasonably in their assessment and treatment of Mr. Harvey," and that they "responded to the risks about which they knew." (Med. Defs.' Br. pg. 13).

In response to the medical defendants' motion for summary judgment, the plaintiff argues that Nurse Dunn, Dr. Musselman, Dr. Berdeen, and Hodges "[c]learly . . . failed to respond to [Harvey's] obvious medical and psychiatric needs," since Harvey spent more than 48 hours in the jail without "proper medication or visitation by the jail doctor or jail psychiatrist." (Pl.'s Resp. to Summ. J. pg. 4). Referencing particular portions of the original and supplemental reports from the plaintiff's expert, Dr. Michael Conner, the plaintiff further argues that the treatment provided to Harvey was so "grossly incompetent" and "inadequate," as to "shock the conscience." (Pl.'s Resp. to Summ. J. pg. 5).

As previously stated, Dr. Conner opined that "a mental health evaluation, [and an] examination by a psychiatrist . . . should have been provided as part of [Harvey's] medical intake"; that "[m]edical staff incorrectly assumed Mr. Harvey was psychotic . . . without recognizing or reporting delirium"; and that Harvey should have been examined, in person, by a physician. (Conner Report pgs. 6-8). Dr. Conner further opined that "[m]edical care in this case was negligent," and that "[n]ursing and mental health staff did not properly report . . . Mr. Harvey's case to the jail psychiatrist." (Conner Supplemental Report pg. 21).

18

Having reviewed the arguments asserted by the plaintiff and the medical defendants, the court agrees with the medical defendants that Nurse Dunn, Dr. Musselman, Dr. Berdeen, and Kristy Hodges are entitled to summary judgment with respect to the plaintiff's deliberate indifference claim. Without a doubt, the record reveals that Harvey had serious medical problems. The plaintiff's claim against these medical defendants fails, however, because the plaintiff has produced no evidence that they actually knew of and disregarded a serious risk of harm to Harvey, or that they actually knew of and ignored a serious need for medical care. See Parrish, 372 F.3d at 302. Accepting Dr. Conner's opinions for purposes of the plaintiff's claim for deliberate indifference, Dr. Conner's opinions, at most, suggest that the medical defendants were negligent in failing to recognize that Harvey was suffering from excited delirium and in failing to appropriately respond to Harvey's symptoms. Neither a missed diagnosis nor negligent treatment, however, is sufficient to establish a violation of Harvey's constitutional rights. See Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986).

Along the same lines, the court concludes that the medical defendants are also entitled to summary judgment with respect to the plaintiff's claim for deliberate indifference against Teresa Campbell. In response to the medical defendants' motion for summary judgment, the plaintiff contends that Campbell was the PHS employee whose actions resulted in Carilion Transport being dispatched to take Harvey to the emergency room, instead of an advanced life support unit. While Dr. Conner repeatedly opines, in his expert reports, that an advanced life support unit should have been requested instead of Carilion Transport, Dr. Conner's opinion is insufficient to establish that Campbell acted with deliberate indifference to Harvey's serious medical needs. Instead, a reasonable jury could, at most, find that Campbell acted negligently in summoning

19

Carilion Transport, and, as previously explained, a showing of mere negligence does not meet the standard for deliberate indifference. Grayson, 195 F.3d at 695.

In short, as to all of the medical defendants, there is simply no evidence to suggest that any of these defendants had reason to understand that Harvey experienced any serious medical condition which necessitated treatment measures other than those afforded. The court concludes, as a matter of law, that none of the medical defendants could be found to have been deliberately indifferent to Harvey's treatment needs and that, at most, certain of these defendants were no more than arguably negligent in failing to appreciate the possibility of more pervasive, life threatening medical problems.[11]

## 2. The Sheriff's Office Defendants

The court turns now to the plaintiff's claim for deliberate indifference against the Sheriff's Office defendants. The United States Court of Appeals for the Fourth Circuit has held that non-medical jail officials, like Sheriff Johnson and her deputies, are entitled to rely on the professional judgment and expertise of trained medical personnel. Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990); see also Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995). To establish a claim for deliberate indifference against these non-medical jail officials, a plaintiff must show that the officials were personally involved with the denial of treatment, that the officials deliberately interfered with the jail physicians' treatment, or that they tacitly authorized or were indifferent to the jail physicians' misconduct. Miltier, 896 F.2d at 853.

---

[11] The court also notes that, according to Harvey's interdisciplinary progress chart, Nurse Paige Puckett was the only member of PHS's medical staff who saw Harvey on Sunday, February 5, 2006, after Harvey had become increasingly unruly and aggressive. As previously stated, the plaintiff did not effect service of process on Puckett and the time for doing so has expired.

Case 7:06-cv-00603-GEC   Document 122   Filed 11/05/08   Page 20 of 34   Pageid#: 2907

In moving for summary judgment, the Sheriff's Office defendants argue that neither Sheriff Johnson nor her deputies had any direct involvement in Harvey's medical or mental health treatment, and that they relied upon the opinions of the jail's medical personnel with respect to Harvey's medical and mental health care. The Sheriff's Office defendants further argue that the deputies took steps to make sure that PHS personnel were aware of and were monitoring Harvey's condition. Finally, the Sheriff's Office defendants argue that the deputies did not act with deliberate indifference by using a blanket to facilitate Harvey's removal from his cell and his subsequent transport to the hospital.

In response to the Sheriff's Office defendants' motion, the plaintiff faults the deputies for extracting Harvey from his cell "via physical force," restraining and placing Harvey in a face-down position for transport, and covering Harvey with a blanket. (Pl.'s Resp. to Summ. J. at 12). Relying on Dr. Conner's deposition testimony, the plaintiff argues that "other options clearly existed," and that the plan of action pursued by the deputies "show[ed] a blatant indifference to Mr. Harvey's serious medical needs." (Pl.'s Resp. to Summ. J. at 12-13).

Having reviewed the record, the court concludes, as a matter of law, that the plaintiff's evidence is insufficient to create a triable issue as to whether the Sheriff or the defendant deputies knowingly disregarded a substantial risk of harm to Harvey. There is simply no evidence that these defendants deliberately interfered with the treatment provided by the medical personnel, or that they tacitly authorized the medical personnel to provide grossly incompetent medical treatment. See Miltier, 896 F.2d at 853. To the contrary, the evidence indicates that deputies closely monitored Harvey, and that they made sure that the medical personnel were aware of Harvey's condition and behavior. In light of such evidence, the court concludes that the

21

Sheriff and the defendant deputies rightfully relied upon the medical personnel's decisions as to the appropriate course of treatment for Harvey's medical needs. See id. at 854.

The court also concludes that the plaintiff's evidence is insufficient to create a triable issue as to whether the deputies acted with deliberate indifference by forcibly removing Harvey from his cell, placing him face down on a stretcher, and covering him with a blanket. While Dr. Conner testified that sedation is the "first line" response for "anyone who is trained in how to recognize and deal with delirium," and that the deputies should have asked a physician whether they could "give [Harvey] an IV . . . or an injection [to] calm him" (Conner Dep. pgs. 230-231), Dr. Conner's opinion is "nothing more than impermissible 20/20 hindsight." Grayson, 195 F.3d at 695. Indeed, the Fourth Circuit has "made clear" that "the question in deliberate indifference cases is not whether the officials could have taken additional precautions – almost invariably, with the benefit of 20/20 hindsight, there are additional precautions that could have been taken – but whether they disregarded an excessive risk to . . . [a detainee's] health or safety." Parrish, 372 F.3d at 309 (internal citation and quotation marks omitted) (emphasis in original).

In this case, the court concludes, as a matter of law, that no reasonable jury could find that the deputies knowingly disregarded an excessive risk to Harvey's health or safety. First, there is simply no evidence that the deputies knew that Harvey was suffering from excited delirium or a serious heart condition, and "[t]he law cannot demand that officers be mind readers." Grayson, 195 F.3d at 695. Additionally, the court notes that the deputies did not begin the process of removing Harvey from his cell until after they were notified that the ambulance had arrived. It was EMT Fisher, a trained medical professional, who directed the deputies to place Harvey face down on the stretcher. Moreover, both EMTs were aware of the fact that Harvey was covered

22

with a blanket and neither voiced any concern. Mark Altman, the EMT who rode in the back of the ambulance with Harvey and who remained with Harvey in the emergency room, specifically testified that he saw no reason to believe that the blanket was causing Harvey any harm. Altman further testified that he checked to make sure that the blanket was not too tight, and that he would have directed the deputies to remove the blanket if he had felt that it was causing Harvey any medical distress. Likewise, Fisher testified that the blanket did not appear to cause Harvey any medical distress, that he did not tell the deputies to remove the blanket, and that he would have done so if the blanket had constricted Harvey's airway. "While the [EMTs'] presence by no means immunizes the officers from liability, the fact that . . . trained medical technician[s] did not recognize [any] risk associated with transporting a handcuffed [detainee covered with a blanket] strongly suggests that the risk was something less than obvious." Parrish, 372 F.3d at 306.

In sum, the plaintiff has failed to forecast sufficient evidence to establish that the deputies actually knew of and disregarded a substantial risk of serious injury to Harvey or that they actually knew of and ignored his serious need for medical care. Id. at 302. Accordingly, the court will grant the Sheriff's Office defendants' motion for summary judgment with respect to the plaintiff's claim for deliberate indifference.

> B. Excessive Force

The plaintiff also argues that the defendant deputies used excessive force against Harvey. For the following reasons, this claim cannot withstand the Sheriff's Office defendants' motion for summary judgment.

To succeed on a claim of excessive force under the Fourteenth Amendment, the plaintiff must show that the deputies "inflicted unnecessary and wanton pain and suffering" upon Harvey. Whitley v. Albers, 475 U.S. 312, 320 (1986). In this regard, "[t]he proper inquiry is whether the force applied was 'in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998) (quoting Whitley, 475 U.S. at 320-321). In addition to this subjective element, the plaintiff must show that "the injury resulting from the officers' actions was more than de minimis." Robles v. Prince George's County, 302 F.3d 262, 269 (4th Cir. 2002).

In moving for summary judgment, the Sheriff's Office defendants argue that none of the deputies "used any measure of force with respect to Harvey other than the most absolutely minimal amount necessary to enable them to manage an extremely combative inmate, in a highly challenging environment that he had contaminated with his own bodily fluids, for the safety of Harvey and for those in his vicinity." (Sheriff's Office Defs.' Br. pg. 35). The defendants further argue that "[t]he deputies were faced with having to extricate Harvey from his cell and obtain control of him so that he could be restrained sufficiently for transportation to the hospital, while Harvey was naked, slick with feces and urine . . . , spitting, yelling, being combative, threatening to throw more bodily fluids, trying to bite, and HIV and Hepatitis C positive." (Sheriff's Office Defs.' Br. pg. 35).

In response to the summary judgment motion, the plaintiff argues, on the basis of Dr. Conner's deposition testimony, that "other options clearly existed, precluding the need for any physical confrontation with Harvey." (Pl.'s Resp. to Summ. J. pg. 13). As previously explained, however, Dr. Conner's opinion that the deputies should have attempted to sedate Harvey

24

constitutes impermissible 20/20 hindsight, <u>Grayson</u>, 195 F.3d at 695, and his opinion is nonetheless insufficient to create a genuine issue of material fact as to whether the deputies acted with malicious or sadistic intent. To the contrary, the court concludes, as a matter of law, that a reasonable jury could only find that the deputies were faced with undoubtedly difficult circumstances, and that the deputies' actions were undertaken in a good faith effort to restrain Harvey, so that he could be transported to the hospital.

The plaintiff also argues, in response to the Sheriff's Office defendants' motion for summary judgment, that EMT Mark Altman observed a deputy "striking Mr. Harvey repeatedly," and that this "create[s] a question of fact . . . as to whether excessive force was employed on Mr. Harvey." (Pl.'s Resp. to Summ. J. pg. 13). The plaintiff's argument, however, is without merit. As previously stated, Altman testified at his deposition that he witnessed a deputy strike Harvey, when Harvey continued to fight and struggle with the deputies. Likewise, in the written report that Altman prepared on the day that Harvey was transported to the hospital, Altman indicated that Harvey had been very combative and that Harvey had been struck in the left lower back, after he failed to comply with a deputy's command. In light of such evidence, there is no indication that Harvey was "struck" for any reason other than to gain control over him so that he could be transported to the hospital.

Moreover, there is no evidence that Harvey suffered any injury whatsoever from being struck in his left lower back by a deputy, much less any injury that "was more than <u>de</u> <u>minimis</u>." <u>Robles</u>, 302 F.3d at 269. Dr. Massello testified during his deposition that he examined Harvey's entire backside during the autopsy, and that he found only one bruise during the autopsy – in the "right <u>upper</u> scapula [or shoulder blade] area – other than that [he] found none." (Massello Dep.

Tr. pg. 16). For these reasons, the Sheriff's Office defendants are also entitled to summary judgment with respect to the plaintiff's claim for excessive force.[12]

## B. Failure to Train and Supervise

In her amended complaint, the plaintiff seeks to hold the Sheriff's Office, Sheriff Johnson, and PHS liable on the theory that they failed to adequately train and supervise the deputies and the medical personnel. However, because the plaintiff's claim against these defendants is predicated on their supervisory roles, the plaintiff's claim against them must also be dismissed. It is well established that there can be no liability under § 1983 on the part of a supervisory official or governmental employer in the absence of a constitutional violation on the part of the employees being supervised. Huggins v. Weider, 105 Fed. Appx. 503, 502 (4th Cir. 2004); see also Young, 238 F.3d at 579 (holding that "a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee").

## III. **Plaintiff's Claims Under State Law**

In her second amended complaint, the plaintiff also asserts the following claims under state tort law: battery, assault, civil conspiracy, "breach of a non-delegable fiduciary duty," intentional infliction of emotional distress, and wrongful death. The court will address each of these claims in turn.

---

[12] In any event, the court notes that the plaintiff is unable to identify the deputy who allegedly struck Harvey in his left lower back. Altman testified at his deposition that he did not know who struck Harvey, and that he would not recognize any of the deputies. Additionally, the Sheriff's Office defendants have submitted affidavits from each of the defendant deputies, in which the deputies aver that they did not punch, hit, or beat Harvey at any time.

26

A.    Assault and Battery

The plaintiff asserts claims for assault and battery against the defendant deputies.  In

Koffman v. Garnett, 574 S.E.2d 258 (Va. 2003), the Virginia Supreme Court identified the

elements of these "independent torts."  Koffman, 574 S.E.2d at 261.  The Court explained that

the "tort of assault consists of an act intended to cause either harmful or offensive contact with

another person or apprehension of such contact, and that creates in that other person's mind a

reasonable apprehension of an imminent battery."  Id.  The Court defined the tort of battery as

"an unwanted touching which is neither consented to, excused, nor justified."  Id.

In moving for summary judgment with respect to these claims, the Sheriff's Office

defendants argue that the deputies' actions were justified in light of the circumstances that they

faced in this case, and thus, that the claims for assault and battery are without merit.  See, e.g.,

McLenagan v. Karnes, 27 F.3d 1002, 1009 (4th Cir. 1994) (holding that the plaintiff's claims for

assault and battery were "patently without merit," since the officer's "actions under the

circumstances were justified").

In response to the defendants' motion, the plaintiff emphasizes that there is evidence that

one of the deputies repeatedly struck Harvey, and that such evidence presents a genuine issue of

material fact as to whether that deputy's use of force was justified.  However, as previously

emphasized with respect to the plaintiff's claim for excessive force, EMT Altman, who allegedly

observed the use of force, testified that a deputy struck Harvey when he continued to fight and

struggle with the deputies.  Nonetheless, even if that deputy used a greater level of force than was

justified under the circumstances, the plaintiff is unable to identify the deputy.  As previously

noted, Altman testified at his deposition that he did not know who struck Harvey, and that he

27

would not recognize any of the deputies. Additionally, the Sheriff's Office defendants have submitted affidavits from the deputies named as defendants, in which the deputies specifically state that they did not punch or hit Harvey at any time. Thus, because a reasonable jury could only speculate as to whether any of the defendant deputies struck Harvey, the Sheriff's Office defendants are entitled to summary judgment with respect to the plaintiff's claims for assault and battery. See Ash, 800 F.2d at 411-412 ("[Unsupported] speculation is not sufficient to defeat a summary judgment motion.").

B.     Conspiracy and Intentional Infliction of Emotional Distress

The Sheriff's Office defendants and the medical defendants are also entitled to summary judgment with respect to the plaintiff's common law conspiracy claim and her claim for intentional infliction of emotional distress. First, there is simply no evidence that any of the defendants "combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." Commercial Business Sys., Inc. v. BellSouth Services, Inc., 453 S.E.2d 261, 267 (Va. 1995). Likewise, the plaintiff's evidence does not satisfy the standard required to prove the tort of intentional infliction of emotional distress. To recover on such claim under Virginia law, a plaintiff must prove that "the wrongdoer's conduct is intentional or reckless; the conduct is outrageous or intolerable; the alleged conduct and emotional distress are causally connected; and the distress is severe." Delk v. Columbia/HCA Healthcare Corp., 523 S.E.2d 826, 833 (Va. 2000). Significantly, the outrageous conduct required to prove this tort has been described by the Virginia Supreme Court as conduct that is "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Russo v. White, 400

28

S.E.2d 160, 162 (Va. 1991) (internal citation and quotation marks omitted). In this case, the court concludes, as a matter of law, that the defendants' conduct, even assuming the truth of the plaintiff's evidence, does not satisfy this rigorous standard.

C.    Breach of a Non-delegable Fiduciary Duty and Wrongful Death

The court now turns to the plaintiff's final claims for breach of a non-delegable fiduciary duty and wrongful death. As the defendants note in moving for summary judgment, the claim for breach of a non-delegable fiduciary duty is seemingly one for negligence against the Sheriff's Office defendants and medical negligence, or malpractice, against the PHS defendants.

1.    The Medical Defendants

Factually, it would seem that the plaintiff's allegations of negligence against the medical defendants constitute the plaintiff's strongest claim. However, the court must conclude that the plaintiff's medical malpractice claim is deficient as a matter of law. In reaching this conclusion, the court notes that the substantive elements of a medical malpractice claim – the applicable standard of care, whether the standard was violated, and whether the violation was the proximate cause of Harvey's injury or death – are questions to be determined by state law. Fitzgerald v. Manning, 679 F.2d 341, 346 (4th Cir. 1982). Under Virginia law, expert testimony is ordinarily necessary to establish each of these elements. Webb v. Smith, 661 S.E.2d 457, 459 (4th Cir. 2008). "Exceptions to this rule exist only in 'those rare cases in which a health care provider's act or omission is clearly negligent within the common knowledge of laymen.'" Id. (quoting Raines v. Lutz, 341 S.E.2d 194, 196 n.2 (Va. 1986)); see, e.g. Webb, supra (holding that a reasonably intelligent juror did not need an expert to explain why the doctor's negligence was the proximate cause of the patient's damages, where the doctor forgot to perform the second of two

29

planned surgical procedures, and as a result, the plaintiff had to undergo surgery on a second occasion).

Having reviewed the record, the court concludes that the present case does not present one of those "rare cases" in which expert testimony is not required. Thus, the court must consider the qualifications of the plaintiff's expert. The plaintiff has designated only one expert witness, Michael Conner, Psy.D. Dr. Conner is a licensed clinical psychologist, who practices exclusively in the state of Oregon. For the following reasons, the court agrees with the medical defendants that Dr. Conner is not qualified to testify regarding the applicable standard of care.

Virginia Code § 8.01-581.20 defines the standard of care in medical malpractice cases and sets forth the qualification requirements for standard of care experts. This court has previously held that the statute's expert qualification requirements are substantive, and thus, that they are applicable to medical malpractice claims filed in federal court. Peck v. Tegtmeyer, 834 F. Supp. 903, 909-910 (W.D. Va. 1992) (Kiser, J.). The pertinent portion of the statute, which sets forth the standard for qualifying as an expert on the standard of care, provides as follows:

> A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.

Va. Code § 8.01-581.20(A) (emphasis added). The Virginia Supreme Court has previously characterized these requirements as the "knowledge requirement" and the "active clinical practice requirement." Wright v. Kaye, 593 S.E.2d 307, 311 (Va. 2004). "Both of the

30

requirements must be satisfied before an expert can testify as to the standard of care." Hinkley v. Koehler, 606 S.E.2d 803, 806 (Va. 2005).

As the following cases illustrate, the Virginia Supreme Court "has consistently applied a strict interpretation to the provisions of [§ 8.01-581.20] in determining whether medical practitioners in fact qualify as expert witnesses." Whaling v. Joyce, 56 Va. Cir. 544, 546 (Va. Cir. Ct. 1997). The Supreme Court addressed the knowledge requirement in Lawson v. Elkins, 477 S.E.2d 510 (Va. 1996). In Lawson, the plaintiff filed suit against an orthopaedic surgeon, after she was injured as a result of undergoing chemonucleolysis treatment. Lawson, 477 S.E.2d at 310. The trial court refused to permit the plaintiff's proposed expert witness, a neurosurgeon, to testify that the defendant breached the standard of care in finding that the plaintiff was an appropriate candidate for such procedure. Id. at 511. On appeal, the Virginia Supreme Court held that the trial court did not abuse its discretion in holding that the neurosurgeon was not qualified to render an opinion on the standard of care imposed upon an orthopaedic surgeon who performs a chemonucleolysis procedure, since the neurosurgeon had not performed the procedure or actually observed the procedure being performed. Id. at 511-512. The Court noted that the fact that the neurosurgeon had received a certificate for participating in an eight-hour seminar on chemonucleolysis was insufficient to satisfy the statute's knowledge requirement. Id. at 511.

The active clinical practice requirement was addressed by the Virginia Supreme Court in Hinkley v. Koehler, supra. The Supreme Court explained that whether a proffered witness meets this requirement is "determined by reference to the relevant medical procedure"; specifically, the court must "examin[e] the context of the actions by which the defendants [are] alleged to have deviated from the standard of care." Hinkley, 606 S.E.2d at 806-807. In Hinkley, the alleged

negligence forming the basis of the action "arose out of the direct patient care provided to Hinkley during her pregnancy; and the management, treatment, and delivery decisions that were made when she sought medical attention because of decreased fetal movements and contractions." Id. Because one of the defendants' experts "did not directly care for, provide treatment or management to, or make delivery decisions for any pregnancy" within the one-year statutory period, the Supreme Court held that the expert did not satisfy the active clinical practice requirement. Id. The Court noted that the expert's work as a teacher and consultant was insufficient. Id. at 808.

Applying the requirements of § 8.01-581.20 and the relevant Virginia Supreme Court precedent, the court agrees with the medical defendants that Dr. Conner is not qualified to render an expert opinion on the standard of care at issue in this case. As the medical defendants emphasize in their motion, Dr. Conner is a clinical psychologist who practices exclusively in Oregon. He is not a medical doctor or a nurse, he is not licensed to practice psychology or any medical specialty in Virginia, he has not received any formal training in Virginia, and he has not received any training regarding the provision of medical or mental health services in a correctional setting.

Additionally, since Dr. Conner is not a medical doctor, the court is of the opinion that he is also not qualified to render an expert opinion on the issue of proximate cause. Cf. John v. Im, 559 S.E.2d 694, 697 (Va. 2002) (holding that because the tendered expert witness was a licensed psychologist, and not a medical doctor, "he was not qualified to state an expert medical opinion regarding the cause of John's injury"); Perdue v. Ford Motor Co., 1998 U.S. Dist. LEXIS 8138, at *13 (W.D. Va. Feb. 26, 1998) (holding that the plaintiff's experts were "not qualified to offer a

32

medical opinion as to the cause of death because they are not physicians nor otherwise properly qualified to offer a medical opinion"). Consequently, because the plaintiff is unable to establish these essential elements, the medical defendants are entitled to summary judgment with respect to the plaintiff's claims for malpractice and wrongful death.

2. The Sheriff's Office Defendants

The court also concludes that the Sheriff's Office defendants are entitled to summary judgment with respect to the plaintiff's claims for negligence and wrongful death. Even if the court assumes that the defendant deputies were somehow negligent in the manner in which they handled Harvey, the evidence establishes, as a matter of law, that the deputies were engaged in an essential governmental function involving the exercise of discretion and judgment at all times relevant to the complaint, and thus, that they are immune from liability under the doctrine of sovereign immunity. See Messina v. Burden, 321 S.E.2d 657, 663 (Va. 1984) (setting forth the factors considered for sovereign immunity); see also Colby v. Bolden, 400 S.E.2d 184, 187 (Va. 1991) (holding that a city police officer's negligent actions involved in the pursuit of a speeding automobile were entitled to the protection of sovereign immunity); Shaffer v. City of Hampton, 780 F. Supp. 342, 344 (E.D. Va. 1991) (holding that even if the plaintiff had asserted a cause of action under the Virginia Wrongful Death Act against the city police officers, the police officers would be entitled to sovereign immunity). While the doctrine of sovereign immunity does not protect governmental actors from liability for conduct amounting to gross negligence, the plaintiff has failed to proffer sufficient evidence of gross negligence on the part of any of the named Sheriff's Office defendants. See City of Lynchburg v. Brown, 613 S.E.2d 407, 410 (Va. 2005) ("[The Supreme Court of Virginia has] defined gross negligence as that degree of

33

negligence which shows an utter disregard of prudence amounting to complete negligence of the safety of another. It is a heedless and palpable violation of legal duty respecting the rights of others. It is want of even scant care and amounts to the absence of slight diligence.") (internal citation and quotation marks omitted).

## Conclusion

The death of any detainee is a tragic occurrence, and the court sympathizes with the plaintiff's loss. Nonetheless, the evidence accumulated in this case, following a lengthy period of discovery, is insufficient to permit the case to proceed to trial against the defendants. Accordingly, the court will grant the motions for summary judgment filed by the Sheriff's Office defendants and the medical defendants, and dismiss the case.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 5th day of November, 2008.

_/s/ Glen E. Conrad_
United States District Judge